# United States Court of Appeals
## For the First Circuit

No. 22-1924

PHILLIP AYALA,

Petitioner, Appellee,

v.

NELSON ALVES, Superintendent, MCI-Norfolk,

Respondent, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark G. Mastroianni, U.S. District Judge]

Before

Montecalvo, Selya, and Lynch, Circuit Judges.

Gabriel Thornton, Assistant Attorney General, Criminal
Bureau, with whom Andrea Joy Campbell, Attorney General, was on
brief, for appellant.
Janet Heatherwick Pumphrey for appellee.

October 25, 2023

**LYNCH**, **Circuit Judge**.    Under the Antiterrorism and
Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-
132, 110 Stat. 1214 (codified as amended in scattered sections of
the U.S. Code), and Supreme Court precedent, federal habeas courts
must give deference to a state court's findings of fact and
application of law. White v. Woodall, 572 U.S. 415, 419-20 (2014).
In addition, when a habeas petitioner asserts a claim of
ineffective assistance of counsel, federal habeas corpus review
must be doubly deferential.    Burt v. Titlow, 571 U.S. 12, 15
(2013).

Petitioner Phillip Ayala was convicted, in 2007 after a
jury trial, of first-degree murder, unlawful possession of a
firearm, and unlawful possession of ammunition.    His conviction
and the denial by the trial court of his motion for a new trial
were affirmed by the Massachusetts Supreme Judicial Court ("SJC")
in a carefully reasoned, unanimous, nineteen-page decision.
Commonwealth v. Ayala ("Ayala"), 112 N.E.3d 239, 241-42 (Mass.
2018).

A Massachusetts federal district court nonetheless
granted Ayala's petition for a federal writ of habeas corpus on
his argument that his state court trial counsel was ineffective.
See Ayala v. Medeiros ("Medeiros"), 638 F. Supp. 3d 38, 46 (D.
Mass. 2022).    Arguing on appeal that the grant of Ayala's petition
was improper, the Commonwealth of Massachusetts seeks to vacate

- 2 -

that order.  We vacate, as the district court erred in applying the AEDPA standard.  Under that standard Ayala's petition must be denied.[1]

## I.  Facts

A.  The Underlying Crimes of First-Degree Murder, Unlawful Possession of a Firearm, and Unlawful Possession of Ammunition

On this habeas review of an ineffective assistance of counsel claim, "[w]e take the facts largely as recounted by the [SJC] decision affirming [Ayala's] conviction, 'supplemented with other record facts consistent with the SJC's findings.'" Field v. Hallett, 37 F.4th 8, 12 (1st Cir. 2022) (second alteration in original) (quoting Yeboah-Sefah v. Ficco, 556 F.3d 53, 62 (1st Cir. 2009)).  The SJC found the facts as follows:

> In the early morning of June 10, 2007, Robert Perez and his friend, Clive Ramkissoon, attended a house party held on the second floor of a house in Springfield.  Upon arriving just before 2 A.M., Perez and Ramkissoon encountered a bouncer on the first floor at the bottom of the stairwell that led to the second floor.  The first-floor bouncer was posted there to search guests before letting them upstairs to the party.  After being searched, the two men went upstairs to the party.  As there were not yet many people at the party, Perez returned to the first floor and began speaking with the first-floor bouncer in the entryway of the stairwell.
>
> Shortly thereafter, as Perez was speaking with the first-floor bouncer, the defendant arrived

---

[1]    We do not consider Ayala's other arguments, which are not before us on appeal.

at the party.  As she had done with Perez and
Ramkissoon, the bouncer attempted to pat frisk
the defendant before allowing him to enter.
The defendant refused.  After a brief argument
related to the search, the defendant
aggressively pushed past the bouncer and
climbed the stairs to the second floor.  A
second bouncer intercepted the defendant on
the stairs and prevented him from entering the
party without having first been pat frisked.
The defendant argued with the bouncer and,
after yelling and screaming at him, was
escorted out of the house.  As the defendant
was descending the staircase to leave, and
just steps away from Perez, the defendant
threatened to "come back" and "light the place
up."  [FN 2]  After leaving the house briefly,
the defendant returned and kicked in the
first-floor door.  [FN 3]

> [FN 2] At trial, a witness who had
> attended the party testified that the
> defendant was upset because he felt that
> hosting a party at the house was
> disrespectful to his niece, who had
> recently been killed at a nearby
> location.

> [FN 3] The door was kicked in with such
> force that police were later able to take
> a footprint impression from the door and
> confirm that it matched the defendant's
> shoe.

Throughout this interaction inside the house,
Perez had an opportunity to observe the
defendant closely for several minutes.  [FN 4]
Concerned by the defendant's threats and
behavior, Perez returned upstairs to find
Ramkissoon.  The two men walked onto the
second-floor porch to "assess the situation"
and saw the defendant pacing back and forth on
the street in front of the house.  Rather than
leave with the defendant still outside, given
his recent threat to "light the place up,"
Perez and Ramkissoon decided to wait on the
porch for a few minutes.  After the defendant

moved out of sight, Perez, Ramkissoon, and a
female friend decided to leave the party.

[FN 4] Robert Perez's account of the
defendant's actions was substantially
corroborated at trial by the testimony of
the first-floor bouncer.

After leaving the house, Ramkissoon and the
woman began walking across the road, while
Perez, who had stopped to tie his shoe,
trailed slightly behind.   As they were
crossing the road, the woman stopped in the
middle of the road directly in front of the
house and began dancing.  Perez walked over to
where the woman was dancing while Ramkissoon
kept moving down the road, to the left of the
house, toward the area where his vehicle was
parked.   As Perez approached the woman to
guide her out of the way of oncoming traffic,
he heard a gunshot and saw a muzzle flash
appear near a street light located on the
sidewalk in front of a property adjacent to
the house.  [FN 5]  Perez saw the defendant
holding a firearm and testified that he was
able to identify the shooter as the defendant
because the muzzle flash from the gun
illuminated the shooter's face.   He then
turned and ran away from the shooting as
several more gunshots rang out.   Perez, who
had previously served in the United States
Army, testified that he heard between five and
seven shots, which he recognized as .22
caliber bullets based on his military
experience.

[FN 5] Perez testified that he saw the
muzzle flash came from "the sidewalk area
under the light," but later noted that he
could not be certain whether the street
light was on at the time of the shooting.

Perez soon circled back to where Ramkissoon's
vehicle was parked and discovered Ramkissoon
face down on the street.   Perez performed
rescue breathing on Ramkissoon and telephoned
the police.   Police officers arrived at the
scene by approximately 3 A.M.   It was later

determined that Ramkissoon died from multiple gunshot wounds. [FN 6] Perez was soon brought to the Springfield police station, where he gave a statement recounting the events of that morning. At the station, Perez identified the defendant from a set of photographs shown to him by police, stating that he recognized the defendant's photograph as the "same person who he had seen in the stairwell not wanting to be pat frisked by the bouncer there, and then firing the gun outside in the street at the victim."

> [FN 6] The police recovered five spent shell casings from the scene of the shooting. The medical examiner also recovered two spent projectiles from Ramkissoon's body. At trial, a police officer with special knowledge of ballistics testified that he performed a microscopic examination of the shell casings and the spent projectiles. Based on the examination, he concluded that all five casings came from a .22 caliber gun. He further concluded that both projectiles extracted from Ramkissoon's body came from the same weapon. The police never located the gun that was used to kill Ramkissoon.

Ayala, 112 N.E.3d at 242-43 (cleaned up).

B.   Ayala's State Criminal Trial

In January 2008 as part of discovery from the Commonwealth in his criminal prosecution, counsel for Ayala received a copy of a letter from the Northampton VA Medical Center which stated that Perez, the Commonwealth's lead witness, "ha[d] been in treatment for Post Traumatic Stress Disorder ["PTSD"] at th[at] VA Medical Center since 4/14/2000 . . . with Dr. Kenneth Lenchitz, PhD., . . . Nina A. Pinger, APRN, BC, CNS, and Lillian

R. Struckus, MSW, LICSW . . . ."  A list was attached of all of Perez's appointments at the VA Medical Center from April 14, 2000, to January 18, 2008, which defense counsel described as totaling 161 appointments.[2]

At trial two key eyewitnesses testified: Natasha Frazier, the D.J. at the party who said Ayala could not have been the shooter, and Perez, who identified Ayala as the shooter.  The defense called Frazier as its eyewitness.  As the judge who heard Ayala's 2014 motion for a new trial later found, the defense counsel's "primary trial strategy" was to secure and support Frazier's testimony that Ayala was not in the area when the shooting occurred.  As stated by the SJC:

> Shortly before the trial was originally scheduled to begin in July 2008, the Commonwealth informed defense counsel that it had recently learned that a witness likely to be called by the defense, [Frazier], was a confidential informant for a Federal gang task force operating in Springfield.  As a result of this new information, the trial was continued several times until over one year later in August 2009.
>
> The Commonwealth's disclosure resulted in multiple motions by the defendant to obtain Federal records detailing [Frazier]'s status as a confidential informant (informant records) and to compel the testimony of Federal agents regarding the same through State court proceedings.  The defendant argued

---

[2]     As noted by the SJC, at trial Perez admitted that this document established that he had "161 appointments with mental health experts at the Veterans Administration." Ayala, 112 N.E.3d at 255.

that the information was material to his
defense because it was necessary to
demonstrate [Frazier]'s credibility as a
witness, which the defendant contended was
exculpatory information.  At various times,
the defendant was informed that a successful
pursuit of this information would require that
he comply with the procedure set forth by
Federal regulations.  The federally mandated
procedure required the defendant to submit a
written request for information describing the
informant records and the subject matter of
the testimony sought.  Federal authorities
would then review the sought-after information
for privilege, confidentiality, and the
likelihood that its disclosure would
compromise ongoing investigations. After this
review, the Federal authorities would report
back to the defendant and either disclose the
requested information or explain why it was
continuing to be withheld.  Despite being made
aware of the Federal procedure, the defendant
refused to comply and continued to
unsuccessfully request that the trial court
judge compel Federal authorities to disclose
this information.

During the time period of the continuance, and
while engaging in the pursuit of the federally
held information, the defense had the
opportunity to depose [Frazier]. At her
deposition, [Frazier] testified to her status
as a confidential informant for the Federal
Bureau of Investigation (FBI), including the
nature of her work and compensation.  She also
testified to her observations on the morning
of the shooting, which supported the
defendant's theory that he was not present at
the scene at the time of the shooting.
Specifically, [Frazier] testified that she
witnessed the defendant driving away from the
scene before the shooting took place, and
instead implicated another individual whom she
witnessed fleeing the scene.  The deposition
also revealed that [Frazier] had telephoned a
Federal agent on or about the morning of the
shooting and described what had occurred.

On the eve of trial, the defendant filed a
motion to dismiss the case based on the
Commonwealth's failure to turn over
[Frazier]'s informant records. The motion was
eventually denied. The defendant then sought
once again to compel the testimony of a member
of the Federal gang task force, but the
subpoena was quashed. Subpoenas for several
other law enforcement officers and an
assistant United States attorney were
similarly quashed. After these subpoenas had
been quashed and the trial was set to begin,
at the suggestion of the trial judge, the
defendant finally submitted a request to
Federal authorities for the informant records
in compliance with the governing Federal
regulations described above.

Id. at 246-48 (footnotes omitted).

On August 12, 2009, before trial began, defense counsel

moved for a subpoena for all of Perez's treatment records beyond

what he had received in January 2008 from the VA Medical Center.

The order, which the court issued on August 13, 2009, mistakenly

read:

It is hereby ordered that KEEPER OF THE
RECORDS at Veteran's Hospital, 421 North Main
Street, Leeds, MA, release to the SUPERIOR
COURT CLERK'S OFFICE, any and all medical
records regarding the treatment of Robert
Perez, treated on or about 2009. This order
does not include psychiatric, psychological,
or social worker records.

(Emphasis added.) The court corrected the error and issued a

revised order on August 14, 2009, which read:

It is hereby ordered that KEEPER OF THE
RECORDS at Veteran's Hospital, 421 North Main
Street, Leeds, MA, release to the SUPERIOR
COURT CLERK'S OFFICE, any and all medical,

psychiatric, psychological, or social worker records regarding the treatment of Robert Perez, treated on or about 2009.

Trial was scheduled to begin on the morning of August 17, 2009. That morning, defense counsel moved for a continuance because he had not yet received a response to his request for Frazier's confidential informant records. As to Perez, defense counsel told the court he did not know "how [he was] supposed to open if [he] d[id]n't know what to say about the . . . percipient witness" and that "there's an issue of competence relative to this witness," a reference to Perez. Both counsel then made a joint motion "to have [the court] order the records be sent overnight," which the court allowed. The court told the parties they would "have the records at the very latest tomorrow morning. . . . You can review the records. If an issue stares this Court in the face regarding mental competency right up to the time [Perez] is called to testify, then I'll take the appropriate steps." The court denied a continuance.

Trial began later that day, August 17, 2009, with the jury, judge, and parties first traveling to the site of the shooting for "a view of the subject premises" before opening statements. After that view the court dismissed the jury for lunch and told counsel that "there[] [was] a courier . . . in the process of returning from the [VA Medical Center] with the necessary documents."

- 10 -

The prosecutor told the court she expected to call three witnesses that afternoon -- first, Sergeant David Martin of the Springfield Police Department; second, Dr. Joann Richmond, a state forensic pathologist; and third, Perez. Defense counsel objected to Perez being called that day because he "ha[d]n't seen the records." The court said it would end the day's proceedings after Dr. Richmond's testimony so the parties could review the records and the court could "have ready, if necessary, someone to conduct an examination" of Perez's competency.

The prosecutor then gave the Commonwealth's opening statement. As part of that statement she told the jury that

> Mr. Perez and Mr. Ramkissoon were on their way to drop Mr. Perez off at his home in his apartment in Springfield when they encountered a young lady . . . who appeared to be going to some type of a party.
>
> . . . .
>
> They gave her a ride [and] . . . parked on Bristol Street. You all had the opportunity to see Bristol Street where it[]s relationship is to this house that you went in.
>
> . . . .
>
> They entered into the party. They were there for a period of time. Then I expect that you'll hear at some point the defendant, Mr. Ayala, arrived at the party, . . . and there was an issue about his coming in or being agreeable to come in.
>
> As a result, he was asked to leave. You'll then hear . . . that Mr. Ayala came back and he kicked in that door.

. . . .

Now, all around this time Mr. Perez is deciding it's probably not a good idea for them to stay at this party. They are getting ready, they are leaving. I believe the testimony is going to be that Mr. Perez and Mr. Ramkissoon and [the young woman] were walking out of the party.

. . . .

I expect Mr. Perez will tell you that he heard shots . . . and he looked. . . . He stood there in the middle of the road where the double yellow line is. Then he saw a man with a gun firing, and he ran and he looked at the guy.

. . . .

Mr. Perez will tell you that when he looked up and he saw the man with the gun, he looked at him. It was the same guy who caused the commotion at the party. It was the same guy who kicked in the door. It was the same guy.

. . . .

Now Mr. Perez, I'm sure you're going to hear, as a result of military service to his country suffers from posttraumatic stress. There are issues that he's had. He was on probation. He was violated. He's been incarcerated. You're going to hear a lot about him and his tale of woe.

But what you're going to hear is that when he turned to see the gunshots in the middle of that road . . . it was the same guy that caused the commotion at the party. The same guy that was kick[ed] out. The same guy that kicked in the door.

The prosecutor did not mention Frazier or her testimony in the

Commonwealth's opening statement.

Defense counsel told the jury his opening statement was his "opportunity to tell you what the defense believes the evidence will be in this particular case."  Defense counsel described the expected testimony of Frazier, a

>   paid confidential informant . . . [who was at the party to] report confidential information of gang activities, on guns, and on drugs at that particular location to her handlers.
>
>   . . . .
>
>   [Frazier] actually saw Mr. Ayala here, who she knew, come in and . . . create a ruckus . . . because of the fact that he felt he was being disrespected, that he was known in the community, that he had a very close relative . . . [who] was shot at the location right at the house next door . . . .  As a result of him being disrespected, he kicked in the door.

Defense counsel stated that

>   [t]he evidence w[ould] establish that when the shooting occurred, the confidential paid federal informant was standing on the porch that you visited today and that she saw what took place downstairs where the shooting took place . . . [and that] upon being debriefed of the situation [by her handlers] said that she knew that Mr. Ayala could not have done this particular crime because she saw him leaving and he was not in the area of where the crime took place and he was not the shooter.  And that she saw a particular automobile . . . that exited the area contemporaneously, or right after, the shooting took place.

As for Perez, defense counsel stated that the prosecution had

>   pointed out to you that Mr. Perez had service in the armed services, that he suffers from PTSD, and I believe the evidence will

> establish for you that he's presently residing
> at [a VA Medical Center] in Northampton.
>
> I believe the evidence will further establish
> for you that at the time of this particular
> incident when he gave the police a statement
> relative to Mr. Ayala's participation in this
> particular event, he had outstanding charges
> pending against him relative to unarmed
> robbery and that eventually he was
> incarcerated relative to violating the terms
> of probation. That during the time that he
> was incarcerated at the state facilities here
> in Massachusetts, he wrote certain letters to
> the office of the district attorney, and I
> believe that the evidence will establish for
> you that he sought to have certain
> considerations relative to the testimony that
> he intended to give in this particular case.

Thus defense counsel established as a major theme that Perez, after being in the armed services, "suffers [present tense] from PTSD" and resided at the VA Medical Center in Northampton.

The prosecutor presented two witnesses on August 17, 2009: Sergeant Martin, an officer who responded to the scene that morning, and Dr. Richmond, who testified that Ramkissoon died as a result of his gunshot wounds. After Dr. Richmond's testimony, at sidebar, the court told counsel that the clerk had received Perez's records from the VA Medical Center and that counsel could review them in the clerk's office. The court then adjourned at 3:39 pm with plans to return the following day, August 18, 2009.

Defense counsel reviewed the 38-page set of records that arrived on August 17, 2009. As it turned out, this 38-page set of records was an incomplete set of Perez's VA Medical Center records.

This 38-page set, which defense counsel received and reviewed, reinforced that as of July 30, 2009, Perez had been diagnosed with "Posttraumatic Stress Disorder"; "Bipolar affective disorder, manic, mild degree"; and "Generalized Anxiety Disorder", and that, as of that date, he was taking three medications to treat those conditions. The 38-page set, however, did not include the notes taken during Perez's counseling sessions with the VA Medical Center.

On August 18, 2009, defense counsel filed motions for a competency evaluation of Perez and for payment authorization for the defense to retain a psychological expert, Dr. Ronald Ebert, both to consult on defense counsel's cross-examination of Perez and then to testify for the defense. When trial resumed that morning, defense counsel's motions were the first point of discussion. With respect to Perez's competency, defense counsel told the court that Dr. Ebert would testify that "a person that is manic obviously is wired high and if he's not on his medications, obviously [Dr. Ebert] doesn't believe [Perez] would be competent to testify."

The court ordered a competency evaluation of Perez by an independent psychologist and reserved judgment on the defense's motion for payment for an expert psychologist until after that evaluation. The court specifically asked the doctor, Dr. Andrew

Bourke,[3] to examine both "today whether [Perez] is competent to testify based on whatever treatment he . . . is receiving at [a VA Medical Center], but also what medication or treatment he may or may not have been receiving on June 10, 2007[.]"

Dr. Bourke conducted a competency evaluation of Perez that day.  Dr. Bourke also "review[ed] the . . . [38-page set of] records."  As to Perez's competence to testify, Dr. Bourke concluded that Perez was "able to provide a recollection of the alleged incident that [was] very close to what [the doctor] was able to review . . . [from] previous testimony [Perez] had given." Dr. Bourke also concluded that Perez was "entirely alert and oriented," "demonstrated intact memory functioning," and "[t]here were no symptoms of major mental illness evident during [the doctor's] interview with [Perez]."  The doctor also "didn't see any evidence [that day] of symptoms of bipolar disorder . . . ." As to Perez's competence to perceive the shooter on June 10, 2007, Dr. Bourke testified that Perez "told [him] that at that time he was not on any medications . . . and he was feeling, prior to the incident, okay.  He was with friends and he wasn't suffering from symptoms of a mental illness at that time."  As the SJC noted, "[f]ollowing the examination, Perez was declared competent to testify."  Id. at 244 n.7.

---

[3]    No party has raised any issue as to Dr. Bourke's impartiality or qualifications at any stage in these proceedings.

Before the prosecution offered Perez's direct testimony, defense counsel repeated his request that Dr. Ebert at least have "an[] opportunity to advise [defense counsel] as to how [he] should conduct [his] cross-examination [of Perez] relative to well-defined mental illness that is verified on the record." Defense counsel also described the testimony Dr. Ebert would offer if the court authorized payment, specifically "that anyone who suffered from a bipolar situation that was manic in its nature, that was not on medication, would be adversely affected in their ability to either perceive or encounter and recounter events that would occur." In response, the court asked how "the psychiatrist, without being totally speculative, [was] going to be able to testify how [Perez] acted on that night when [the doctor] wasn't there?" The court also stated,

> I can understand why you're asking to [consult an expert] so you might be able to cross-examine, but I don't think it r[]ises to the level of just bringing in an expert now and testifying as to what he would opine regarding how he conducted himself or what his percipient qualities were on that particular day if there's no foundation laid that he was suffering from that disease on that day.

The court reserved judgment on counsel's motion for payment for an expert until after Perez's direct testimony, but ultimately granted authorization for payment related to consultation on defense counsel's cross-examination of Perez.

The prosecution presented Perez's direct testimony that afternoon, August 18, 2009.  The SJC's description of Perez's testimony is supported by the record.  Specifically with respect to his identification of Ayala as the shooter, Perez testified as follows:

> Q. . . . [Y]ou looked towards where the shots were coming from; correct?
>
> A. Right.
>
> Q. And could you see a firearm?
>
> A. Yes.
>
> Q. And could you see someone with a firearm?
>
> A. Yes.
>
> . . . .
>
> Q. . . . So when you looked back, the shots were coming from -- did you see the person holding a gun?
>
> A. Yes.
>
> . . . .
>
> Q. . . . Did you recognize the shooter?
>
> A. Yes.
>
> Q. Who did you recognize the shooter as?
>
> A. Mr. Phillip Ayala, the person who came and said he would light the party up.

The court then dismissed the jury for the day and addressed defense counsel's pending motion for funds for an expert psychologist.  The court first stated that it "discerned from [its] observations and . . . hearing [of Perez's direct testimony] that

there was no[t] one scintilla of vagueness, lack of clarity, anything incomprehensible or anything other than detailed testimony . . . ." For that reason the court told defense counsel it "w[ould] not be allowing an expert to testify in the v[e]in requested by the defense" unless "something countervailing and compelling in cross-examination emerge[d]." (Emphasis added.) The court did, however, "allow the motion for funds for [defense counsel] . . . to consult [an expert psychologist] . . . prior to commencement of cross-examination [scheduled to take place the next day] . . . and for those purposes only." Defense counsel did in fact consult with Dr. Ebert, who also had access to the 38-page set of records, to prepare his cross.

As to the cross-examination of Perez the next morning after defense counsel had consulted with his expert, the SJC found:

> The reliability of Perez's identification was vigorously challenged by defense counsel on cross-examination. The defense confronted Perez on his ability to accurately identify the shooter under the lighting conditions at the time of the shooting, his recollection of certain events that morning, and the discrepancies between Perez's statement to police on the morning of the shooting and his trial testimony regarding the defendant's height and clothing. Additionally, the defense presented evidence showing that Perez suffered from bipolar disorder and posttraumatic stress disorder (PTSD), the latter being a result of his military service. Specifically, evidence showed that he sought psychiatric counselling and used marijuana to cope with the effects of his diagnoses. There was no evidence, however, that Perez was

- 19 -

> either suffering the effects of these
> diagnoses or under the influence of marijuana
> at the time of the shooting.

Id. at 243-44 (footnotes omitted). Defense counsel drew admissions from Perez that he "went from unscheduled [as-needed counseling] appointments to [regularly] scheduled [counseling] appointments" after the shooting, "was hospitalized" for his mental health in the fall of 2007, "start[ed] taking . . . [prescription] drugs" to treat his mental health conditions "[a]fter October of 2007," was "diagnosed with borderline personality disorder and also bipolar disorder, mild manic after 2007," and "had a counseling session on June 11th" of 2007, the day after the shooting. Perez stated the effect of his PTSD on him "was minimal. It's just basically . . . remembering a bad time, a bad dream, a bad situation . . . ." Perez stated that his "appointments weren't necessarily all based on PTSD" and that he also "went through a divorce" between 2000 and 2008 which caused him emotional distress for which he also sought counseling.

The prosecution then offered the testimony of four more witnesses: Detective Lieutenant Kenneth F. Martin of the Massachusetts State Police who specialized in footwear impression analysis and identification; Equilla Haines, the first-floor bouncer the night of the shooting; Sergeant Mark Rolland of the Springfield Police Department, who had responded to the scene of the shooting that morning; and Sergeant John Crane, a ballistician

with the Massachusetts State Police who analyzed the shell casings and projectiles recovered from the shooting.

The prosecution rested after Sergeant Crane's testimony. Defense counsel then moved for a directed verdict because "the defendant was never identified" in court, which motion the court denied.

The defense called its witness, Natasha Frazier.   The SJC found and the record supports that

> the defense called a sole witness, [Natasha Frazier], who was the disc jockey at the party.  [Frazier] testified that she knew the defendant and looked up to him, and had seen him multiple times that morning.  [Frazier] also testified that at one point, she was on the second-floor porch and saw the defendant emotional and upset outside after he had been kicked out of the house.  She and others attempted to comfort the defendant and suggested that he go home.  She testified to then witnessing the defendant leave the party and drive away.  [Frazier] was adamant that the defendant left approximately thirty to forty-five minutes before the shooting, stating that he was "gone a long time before the shooting even went down."  In response to further questioning on her certainty that the defendant was not at the scene at the time of the shooting, she testified, "He was not there.  Put my kids on it."  Although she did not witness the shooting, she testified that she observed a red Taurus motor vehicle "skidding off" from the scene immediately after the shooting.

Id. at 244 (footnote omitted).  Frazier's testimony stretched into August 21, 2009.[4]

After Frazier's testimony, defense counsel made an offer of proof as to an additional witness.  Defense counsel offered the testimony of Richard Williams, an individual he had "direct[ed] to . . . provide security for [Frazier]" after Frazier expressed "safety concerns" arising out of her role as a witness.  The court did not allow Williams's testimony, concluding that Frazier "didn't express any concern for [her safety]" in her testimony, making Williams's testimony irrelevant.  The court then dismissed the jury for the weekend, with the defense formally leaving its case open over the weekend in the hope that the federal government would respond to its request for records related to Frazier's confidential informant status before the trial resumed on Monday morning.

By the morning of Monday, August 24, 2009, those records as to Frazier had arrived.  Based on the content of those records, defense counsel made an offer of proof in an effort to call one of Frazier's handling officers to support her credibility.  The court rejected that offer of testimony and the defense rested.  Defense

---

[4]    On August 21, 2009, the court also heard argument on defense counsel's motion for a mistrial.  The defense argued that Frazier's federal agent handlers engaged in improper "intimidation" and sought to both discourage Frazier from testifying and to influence the substance of her testimony.  The court denied this motion.

counsel moved for a required finding of not guilty, which motion the court denied.

Both sides gave closing statements that day, August 24, 2009. In his closing argument defense counsel argued that there were "basically two witnesses that . . . testif[ied] to contradictory conclusions." Defense counsel stated that Perez's mental illnesses "are difficult illnesses and they may impact his ability to see and conceptualize what was actually happening." Defense counsel contrasted Perez's identification testimony with Frazier's testimony, who "says she knew that it wasn't Phillip Ayala. He had left. She saw he was nowhere in the location at the time of the shooting." For that reason, defense counsel argued, "this particular case . . . boil[ed] down to very basically a misidentification."

In closing statements for the Commonwealth, the prosecutor responded that "the detail [Perez] was able to recount to [the jury]" about the events of June 10, 2007, supported his identification of Ayala as the shooter. She argued, "[h]e's paying attention. He's alert. He's using perhaps his military background. He turns and he sees the person that he recognizes as [Ayala]." She also argued that Frazier "didn't see the shooting . . . [b]ut her friend[,] . . . the person that she looked up to, . . . she said that he wasn't anywhere to be found." Finally, she

acknowledged that "Perez has issues.  He told you as a result of military duty, he suffers from [PTSD]."

The jury convicted Ayala on all three counts on August 24, 2009; he was sentenced to life without parole.  He sought state post-conviction relief.

C.    Ayala's State New Trial Motion and Appeal to SJC

Ayala filed a motion for a new trial on February 10, 2011.  Id. at 241.  Ayala's post-trial counsel received a complete set of Perez's VA Medical Center records in February 2014, including approximately 100 half-page "Progress Notes" recorded by Perez's therapists during his counseling sessions from April 17, 2000, to July 24, 2009, which had been missing earlier at trial.[5] Ayala then amended his motion for a new trial.  As amended, Ayala argued that his trial counsel was ineffective for (1) failing to retain and call an expert witness on eyewitness identification, (2) failing to retain and call an expert witness on ballistics to testify about the characteristics of a muzzle flash, and (3) failing to notice the absence of Perez's psychological records.

---

[5]    The February 2014 production, which included all of Ayala's medical records through February 8, 2014, totaled 513 pages.  Although the district court and Ayala refer to "[h]undreds of pages of psychological records" in that production, many of the records in the February 2014 production were related to treatment Perez received after Ayala's trial in August 2009, duplicative of the records that defense counsel received during trial, and/or irrelevant to Perez's mental health.

In support of his argument that defense counsel was
ineffective for failing to notice the missing records, Ayala
submitted Perez's complete medical records and offered an
affidavit from a psychiatrist, Dr. Jose Hidalgo, whom he argued he
could have offered as an expert if counsel had noticed and
corrected the absence of the records.  Dr. Hidalgo's affidavit
stated his opinion that Perez's "mental and emotional conditions
had the potential to and may have interfered with Mr. Perez's
abilities to accurately perceive or recollect the events of June
10, 2007" and that "[m]ind altering substances" like marijuana "in
principle can reduce the ability to accurately perceive and recall
past events."  (Emphasis added.)

> [T]he motion judge, who was not the trial
> judge, allowed an evidentiary hearing on trial
> counsel's failure to retain and call experts
> on eyewitness identification and ballistics.
> The motion judge did not allow an evidentiary
> hearing, however, on trial counsel's failure
> to notice the absence of Perez's psychological
> records that were subject to disclosure after
> finding that the defendant had not raised a
> substantial issue [on that argument]
> warranting further hearing.

Id. at 252.

Defense counsel testified at Ayala's evidentiary hearing
that his "primary . . . strategy at [trial] was to prese[nt] the
testimony of [Frazier] which . . . posited that Mr. Ayala was not
the shooter, that she saw the event from a place where she had a
vantage point and that she named other individuals as the actual

shooters involved." He testified that it was "a fair representation" to say that he did "not pursu[e] obtaining the mental health records . . . because [he was] focus[]ed on other aspects of the case that [he] deemed essential and more important."

Defense counsel further testified that he "felt with Natasha Fra[z]ier's testimony and [his] cross-examination of Mr. Perez, that the case would be adequately put before the jury," and that he "believe[d] it was tactically the correct thing not to attack [Perez] as a veteran with PTSD."

The new trial motion judge denied the motion and summarized his findings as follows:

> Ayala was represented at trial by Attorney Greg Schubert, a criminal defense attorney with over thirty-five years' experience in defending allegations of first degree murder. He has tried forty-seven first degree murder cases. . . . [Schubert's] primary trial strategy was to secure the trial testimony of [Frazier] who was the disc jockey at the party. . . . Schubert believed that Frazier's testimony, coupled with his cross-examination of [Perez] regarding his mental state and the inconsistencies in his statements to the police, was sufficient to raise a reasonable doubt regarding [Perez]'s identification of Ayala as the shooter.

> . . . .

> [T]here was evidence that Perez was familiar with Ayala from interacting with him earlier in the evening. He had ample opportunity to view Ayala prior to the shooting in a non-stressful environment. Ayala walked within inches of Perez twice when he ascended and then descended the stairs which provided

> access to the party on the second floor. Perez
> took note of Ayala's facial features as he
> shouted threats when he was being thrown out
> of the party. Perez saw Ayala a third time
> when he observed him standing in the front
> yard as he looked down from the balcony. In
> addition, other witnesses corroborated
> [Perez]'s testimony that Ayala was the
> individual who made a scene at the party,
> threatening to return and "light this place
> up."
>
> . . . .
>
> On cross-examination trial counsel emphasized
> that Perez observed the shooter for only a
> matter of seconds, that his physical
> description of the shooter was inconsistent,
> and that he suffered from [PTSD]. Similarly,
> trial counsel thoroughly argued
> misidentification in closing.

With respect to the eyewitness identification expert,

the motion judge concluded that trial defense counsel's "decision

to [challenge Perez's identification of Ayala] without an expert

was not manifestly unreasonable when made and the absence of an

expert did not deprive Ayala of an otherwise available substantial

ground of defense." The motion judge denied Ayala's new trial

motion in full and did not specifically address Ayala's argument

with respect to the missing records.[6]

Ayala's appeal of the denial of his new trial motion was

combined with his merits appeal before the SJC. Id. at 242. Ayala

---

[6]    The motion judge also concluded that, with respect to a
ballistics expert, he "[could not] conclude that, but for counsel's
failure [to secure an expert on muzzle flash], the outcome of the
case would have been different."

challenged the merits of his conviction on two grounds.  First, he argued that the evidence before the jury was insufficient to support a conviction because "Perez[] testi[fied] that he was able to identify [Ayala] as the shooter because the muzzle flash from the gun 'illuminated' [Ayala]'s face [and] the illuminating capacity of a muzzle flash is not within the ordinary, common experience of a reasonable juror . . . ." Id. at 244-45.  The SJC rejected this argument because it found that "there was independent evidence that would permit a rational juror to reasonably infer that the crime scene was sufficiently illuminated at the time of the shooting to provide Perez with the opportunity to identify [Ayala] as the shooter" -- specifically, a police officer's testimony that "the street lights near the location of the shooting and the exterior lights on a nearby building were illuminated when he arrived at the crime scene at approximately 4:30 A.M."  Id. at 245.

Second, as the SJC described it, Ayala argued that

his due process rights under the Fifth and Sixth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights were violated by (i) the Commonwealth's failure to obtain and turn over discovery related to the sole defense witness's status as a confidential informant, and (ii) the judge's decisions declining to compel various State and Federal law enforcement officers to testify to the defense witness's status as a confidential informant.

Id. at 246.  The SJC rejected this argument because it concluded that "[t]he information related to [Frazier]'s status as a confidential informant was not in the Commonwealth's possession or control, but rather was in the possession and control of the Federal government."  Id. at 248.  It also concluded that although "under certain circumstances [the SJC] will require the Commonwealth to bear the burden of securing the cooperation of the Federal government with regard to the disclosure of exculpatory information[,] . . . [a]fter weighing [the applicable] factors, . . . the Commonwealth was not required to bear the burden of securing the release of the information" in this case.  Id. at 248, 252.

> The SJC then described Ayala's arguments that
>
> > the motion judge erred in denying his motion [for a new trial] with respect to his arguments that his trial counsel was ineffective for (i) failing to retain and call an expert witness on the accuracy of eyewitness identifications, (ii) failing to retain and call an expert witness on ballistics evidence to testify about muzzle flashes, and (iii) failing to notice the absence of medical records that provided further insight into Perez's mental health issues and drug use.

Id. at 252.[7]  The SJC concluded that the failure to call an eyewitness identification expert was not "manifestly unreasonable

---

[7]    The SJC considered Ayala's ineffective assistance claim under Massachusetts's state law standard specific to ineffective assistance claims arising out of certain types of criminal

when it was made" and that the failure to call a ballistics expert "was not likely to have influenced the jury's conclusion." Id. at 253, 255.

> With respect to the missing records, the SJC found that
>
>> Perez testified that he had been diagnosed with PTSD and bipolar disorder, that he received counselling and medication to treat the diagnoses, and that he had had a counselling session on the day after the murder. He further testified that over the period of approximately eight years following his discharge from the military, he had sought counselling for his PTSD 161 times and that he suffered from "night terror[s]" and sleeplessness as a result of his PTSD. [FN 21] Additionally, he testified that he used marijuana to cope with the effects of his PTSD diagnosis.
>>
>>> [FN 21] At the evidentiary hearing on the defendant's motion for a new trial, trial counsel testified that, at the time of the trial, he believed it would have been a poor tactical choice to "attack" Perez in front of the jury, given that Perez was a veteran suffering from [PTSD]. Therefore, it is unlikely that trial counsel would have used the information

---

convictions, including those for first-degree murder, not the federal standard set forth in Strickland v. Washington, 466 U.S. 668 (1984). See Ayala, 112 N.E.3d at 252-53 ("[W]e apply the more favorable standard of G.L. c. 278, § 33E and review [Ayala's] claim to determine whether there was a substantial likelihood of a miscarriage of justice. Under this review, we first ask whether defense counsel committed an error in the course of the trial. If there was an error, we ask whether it was likely to have influenced the jury's conclusion." (citations omitted)). We have recognized that this standard is "at least as generous to the defendant as [the Strickland standard]." Horton v. Allen, 370 F.3d 75, 86 (1st Cir. 2004). We consider the SJC's conclusion under this more generous standard to incorporate the conclusion that Ayala had failed to demonstrate prejudice under Strickland.

in the missing records to further attack
Perez's ability to perceive the shooter
due to his PTSD diagnosis even if counsel
had them.

Notably, there was no evidence -- either
introduced at trial or contained within the
missing records -- that suggests that Perez's
mental health struggles or drug use affected
his ability to perceive the defendant on the
morning of the shooting. For example, a
defense expert's proffered testimony only
acknowledged that Perez's mental health
struggles "had the potential to and may have
interfered with Mr. Perez's abilities to
accurately perceive or recollect the
[shooting]." Trial counsel argued this point
specifically during closing, stating that
Perez's diagnoses "are difficult illnesses and
they may impact his ability to see and
conceptualize what was actually happening."
Additionally, although the missing records
suggested that Perez was more dependent on
marijuana than his testimony let on, there was
no evidence that he was under the influence of
marijuana on the morning of the shooting. The
defendant's proffered expert on this point
would not have materially added to the
defense, as he was prepared only to testify
that individuals have a reduced ability to
accurately perceive reality and recall past
events while under the influence of mind-
altering substances. Because the substance of
the missing records and proffered expert
testimony was already presented to the jury,
any error on the part of trial counsel in
failing to notice the missing records was not
likely to influence the jury's conclusion.
The motion judge therefore did not err in
denying the defendant's motion for a new
trial.

Id. at 255-56 (citations omitted and emphasis added). The SJC

affirmed Ayala's convictions and the denial of his motion for a

new trial, rejecting Ayala's claim that defense counsel was

constitutionally ineffective for not obtaining the actual treatment session notes of the doctors' sessions with Perez from April 2000 to July 2009.  Id. at 257.

>    D.    Ayala's Petition for Federal Habeas Corpus

The appeal before us arises out of the grant by the district court of Ayala's petition for federal habeas relief on the ineffective assistance of counsel claim rejected by the SJC. Ayala filed a petition for a writ of habeas corpus in the United States District Court for the District of Massachusetts on April 21, 2020, which he amended with the court's permission on September 2, 2020.  Medeiros, 638 F. Supp. 3d at 66.  His petition set forth three broad arguments for federal habeas relief: that the SJC's decisions on (1) his insufficiency of the evidence argument, (2) his due process argument, and (3) his ineffective assistance of counsel arguments were each contrary to, and an unreasonable application of, the law and also based on an unreasonable determination of the facts.  Ayala identified three elements of his counsel's performance that, in his view, it was unreasonable for the SJC to conclude were not deficient: counsel's failure to (1) "retain an expert on eyewitness identification," (2) "retain a firearms expert," and (3) "notice that he had not received [Perez's] psychological records."

The district court issued a writ of habeas corpus based on Ayala's argument that his counsel was ineffective for failing

to notice that Perez's records were incomplete.  Id. at 46.  The
district court concluded that the SJC's decision that Ayala failed
to show prejudice was both based on an unreasonable determination
of the facts and amounted to an unreasonable application of the
law.  Id. at 66.  First, the district court held that

> [t]he SJC's finding that "it is unlikely that
> trial counsel would have used the information
> in the missing records to further attack
> Perez's ability to perceive the shooter due to
> his PTSD diagnosis even if counsel had them"
> is fundamentally flawed and does not support
> its factual finding as to the value of the
> psychological records.

Id. at 74.  Second, the district court held that

> [t]he SJC's finding that "there was no
> evidence . . . contained within the missing
> records . . . that suggests that Perez's
> mental health struggles . . . affected his
> ability to perceive the defendant on the
> morning of the shooting" is contradicted by a
> wealth of evidence in the psychological
> records and, in light of that evidence, is
> patently unreasonable.

Id. at 72 (omissions in original).  Finally, the district court
held that

> [t]he state court's finding that "the
> substance of the missing records and proffered
> expert testimony was already presented to the
> jury" and "the additional records would not
> have added to the information already at trial
> counsel's disposal and used in cross-
> examination" is also unreasonable . . . .

Id.[8]

---

[8]    Because we conclude that the district court erred in its
federal habeas review of the SJC's prejudice determination under

This timely appeal followed.

## II.  Standard of Review

Strickland's test for ineffective assistance interacts with AEDPA's limitations on federal habeas review of state court decisions to create a "doubly deferential" lens through which both we and the district court must view the state court's decision. See Burt, 571 U.S. at 15.

This court is "effectively in the same position as the district court vis-à-vis the state court record and ha[s] the ability to review that record from the same vantage point" and thus reviews the district court's decision de novo. Pike v. Guarino, 492 F.3d 61, 68 (1st Cir. 2007). Here, although the district court determined that "extensive supplementation [of the SJC's recitation of the facts was] necessary," Medeiros, 638 F. Supp. 3d at 46, its supplementary facts were drawn entirely from the record before the state court, not from independent factfinding such as an evidentiary hearing. We review its decision de novo and give its reading of the state court record no deference.

AEDPA "demands that a federal habeas court measure a state court's decision on the merits against a series of 'peculiarly deferential standards.'" Porter v. Coyne-Fague, 35

───────────────

Strickland and AEDPA, and that resolves this case, we do not consider other aspects of its decision.

F.4th 68, 74 (1st Cir. 2022) (quoting Cronin v. Comm'r of Prob., 783 F.3d 47, 50 (1st Cir. 2015)).  Specifically, 28 U.S.C. § 2254(d) provides that "a writ of habeas corpus . . . shall not be granted . . . unless" the state court decision either

> (1) resulted in a decision that was contrary
> to, or involved an unreasonable application
> of, clearly established Federal law, as
> determined by the Supreme Court of the United
> States; or (2) resulted in a decision that was
> based on an unreasonable determination of the
> facts in light of the evidence presented in
> the State court proceeding.

(Emphasis added.); see also Field, 37 F.4th at 16-17 (discussing this provision).

Subsection (d)(1) further divides into two clauses that address the state court's legal analysis.  Subsection (d)(1)'s "'contrary to' clause applies when 'the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" Porter, 35 F.4th at 74 (alterations in original) (quoting Williams v. Taylor, 529 U.S. 362, 412-13 (2000)).  The district court did not evaluate Ayala's habeas petition under this "contrary to" prong, nor does Ayala defend the writ on these "contrary to" grounds.

Subsection (d)(1)'s "unreasonable application" clause "applies when 'the state court identifies the correct governing

legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the [petitioner]'s case.'" Id. (first alteration in original) (quoting Williams, 529 U.S. at 413). "[T]he 'unreasonable application' clause applies 'if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no "fairminded disagreement" on the question.'" Id. at 75 (quoting White, 572 U.S. at 427). "[T]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Id. (internal quotation marks omitted) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

Relief under subsection (d)(2) requires "a showing that the state court decision 'was based on an unreasonable determination of the facts' on the record before that court." Id. (quoting 28 U.S.C. § 2254(d)(2)). "This demanding showing cannot be made when '"[r]easonable minds reviewing the record might disagree" about the finding in question.'" Id. (alteration in original) (quoting Brumfield v. Cain, 576 U.S. 305, 314 (2015)). And "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood v. Allen, 558 U.S. 290, 301 (2010).[9]

---

[9]    AEDPA further provides that "a determination of a factual issue made by a State court shall be presumed to be correct

A.    Ineffective   Assistance   of   Counsel   Standard   Under
<u>Strickland</u> Even Before Applying Deference to State Court

To   succeed   on   an   underlying   <u>Strickland</u>   claim   of
ineffective assistance of counsel in either state or federal court,
Ayala   "must   show   both   deficient   performance   by   counsel   and
resulting prejudice." <u>Thompson</u> v. <u>United States</u>, 64 F.4th 412,
421 (1st Cir. 2023) (internal quotation marks omitted) (quoting
<u>Tevlin</u> v. <u>Spencer</u>, 621 F.3d 59, 66 (1st Cir. 2010)); <u>see also</u>
<u>Strickland</u>, 466 U.S. at 687.

To    establish    deficient    performance,    Ayala    must
"establish   that   his   'counsel's   representation   fell   below   an
objective standard of reasonableness.'" <u>Thompson</u>, 64 F.4th at 421
(internal quotation marks omitted) (quoting <u>Tevlin</u>, 621 F.3d at
66).   "A   court   considering   a   claim   of   ineffective   assistance   must
apply   a   'strong   presumption'   that   counsel's   representation   was
within   the   'wide   range'   of   reasonable   professional   assistance."
<u>Harrington</u> v. <u>Richter</u>, 562 U.S. 86, 104 (2011) (quoting <u>Strickland</u>,
466 U.S. at 689).

To   show   prejudice,   Ayala   "must   demonstrate   a   reasonable
probability that, but for counsel's unprofessional errors, the

---

[unless] rebutt[ed] . . . by clear and convincing evidence." 28
U.S.C. § 2254(e)(1).  "The Supreme Court has carefully left . . .
open" the question of how subsections (d)(2) and (e)(1) fit
together, and "the question remains open in this circuit" as well.
<u>Porter</u>, 35 F.4th at 79.  As we explain below, we need not resolve
the question to decide this case.

result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. (internal quotation marks omitted) (quoting Strickland, 466 U.S. at 694).  "[S]how[ing] that the errors had some conceivable effect on the outcome of the proceeding" is insufficient; instead, Ayala must establish that the errors were "so serious as to [have] deprive[d] [him] of a fair trial, a trial whose result is reliable."  Id. (quoting Strickland, 466 U.S. at 687, 693).  "And if it turns out that the investigation would not have led to any information that counsel would have used at trial, then his dereliction can hardly have caused prejudice."  Lang v. DeMoura, 15 F.4th 63, 69 (1st Cir. 2021).

   B.   Deferential Review Under AEDPA of Ineffective Assistance
        Claim

   "Since an ineffective assistance of counsel claim is a mixed question of law and fact, [on habeas review] it is evaluated under the 'unreasonable application' clause of § 2254(d)."  Ficco, 556 F.3d at 70 (citations omitted).  "'Surmounting Strickland's high bar is never an easy task,' . . . [and] [e]stablishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult."  Harrington, 562 U.S. at 105 (quoting Padilla v. Kentucky, 559 U.S. 356, 371 (2010)).  "The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly'

so."  Id. (citations omitted) (first quoting both Strickland, 466
U.S. at 689, and Lindh v. Murphy, 521 U.S. 320, 333 n.7 (1997);
and then quoting Knowles v. Mirzayance, 556 U.S. 111, 123 (2009)).

        To satisfy the prejudice requirement under Strickland on
a habeas petition governed by AEDPA, Ayala must show not just that
"it is 'reasonably likely' the result would have been different,"
id. at 111 (quoting Strickland, 466 U.S. at 696), but also that it
was unreasonable for the state court to conclude otherwise, cf.
id. at 112; see also Smith v. Thompson, 329 Fed. App'x 291, 294
(1st Cir. 2009) ("[B]ecause this case reaches us on habeas review,
we . . . evaluate . . . only whether the Appeals Court reached an
unreasonable conclusion on the prejudice question.").  We may grant
habeas relief "if, and only if, . . . there could be no fairminded
disagreement on the question."  Porter, 35 F.4th at 75 (internal
quotation marks omitted) (quoting White, 572 U.S. at 427).

**III. Application of These Standards to SJC Decision**

        The district court held three of the SJC's factual
findings regarding prejudice were unreasonable under subsection
(d)(2).[10]  First, the district court determined "[t]he SJC's
finding that 'it is unlikely that trial counsel would have used
the information in the missing records to further attack Perez's

---

        [10]  The district court expressly declared two of the SJC's
factual findings unreasonable.  It called a third finding
"fundamentally flawed", which we take to mean the district court
considered the finding to fail under 28 U.S.C. § 2254(d)(2).

ability to perceive the shooter due to his PTSD diagnosis even if he had them' [was] fundamentally flawed . . . ." Medeiros, 638 F. Supp. 3d at 74.

Second, the district court held that "[t]he SJC's finding that 'there was no evidence . . . contained within the missing records . . . that suggests that Perez's mental health struggles . . . affected his ability to perceive the defendant on the morning of the shooting' . . . [was] patently unreasonable." Id. at 72 (first three omissions in original) (quoting Ayala, 112 N.E.3d at 256).

Third, the district court held that "[t]he state court's finding that 'the substance of the missing records and proffered expert testimony was already presented to the jury' and 'the additional records would not have added to the information already at trial counsel's disposal and used in cross-examination' [was] also unreasonable . . . ." Id.

Relying in large part on its conclusion that the SJC made what in its view were unreasonable factual determinations, the district court separately held that the SJC's decision was an unreasonable application of the law under subsection (d)(1).[11] Id.

---

[11] The district court separately discussed distinct rationales for granting relief under subsections (d)(1) and (d)(2). As discussed above, Ayala's ineffective assistance of counsel claim is a "mixed question of law and fact" which we "evaluate[] under the 'unreasonable application' clause of § 2254(d)." Ficco, 556 F.3d at 70. To the extent the reasonableness

at 75-77.  We hold that (1) Ayala has not met his burden to show
the SJC's factual determinations were unreasonable, no matter
which standard applies, and (2) the SJC's decision was not an
unreasonable application of the law.

>    A.    The District Court Erred in Concluding That the SJC's
>    Holding That Defense Counsel Would Not Have Used the
>    Information in the Missing Records Was Unreasonable

The district court called "[t]he SJC's finding that 'it
is unlikely that trial counsel would have used the information in
the missing records to further attack Perez's ability to perceive
the shooter due to his PTSD diagnosis even if he had them' . . .
fundamentally flawed."  Id. at 74.  The district court and Ayala
on appeal argue that this finding by the SJC was unreasonable
because trial counsel "could have used [these records] to explore
the effect of Mr. Perez's PTSD symptoms on his percipient abilities
and opened a fruitful area for expert testimony . . . ."  Id.

Our careful review of the state trial records supports
the SJC's conclusion and certainly precludes any finding the
conclusion was unreasonable.  First, Natasha Frazier's testimony
and credibility -- not Perez's mental health and drug use -- was
defense counsel's "primary trial strategy."  Trial defense counsel
testified that it was "a fair representation" to say that he did

---

of the SJC's factual determinations bears on the reasonableness of
its application of the law, we incorporate review of those
determinations in our analysis under the unreasonable application
clause as discussed below.

"not pursu[e] obtaining the mental health records . . . because [he was] focused on other aspects of the case that [he] deemed essential and more important." These choices were a reasonable trial strategy consistent with defense counsel's strategy that it was "tactically the correct thing not to attack [Perez] as a veteran with PTSD."

Furthermore, Ayala's trial counsel did not gloss over Perez's mental health struggles. In his cross-examination of Perez, Ayala's trial counsel established that Perez "went from unscheduled [as-needed counseling] appointments to [regularly] scheduled [counseling] appointments" after the shooting, "was hospitalized" for his mental health in the fall of 2007, "start[ed] taking . . . [prescription] drugs" to treat his mental health conditions "[a]fter October of 2007", was "diagnosed with borderline personality disorder and also bipolar disorder, mild manic after 2007," and "had a counseling session on June 11th" of 2007, the day after the shooting.

As the SJC found, counsel established these facts through questioning while also pursuing his general strategy of avoiding attacking Perez on account of his PTSD. It was reasonable for the SJC to conclude that this strategy would be undercut were defense counsel to probe into the individual sessions with

providers.  That strategy was reasonable[12] and defense counsel's questioning was consistent with it.  Even if it were accurate that defense counsel "could have used [these individual session records] to explore the effect of Mr. Perez's PTSD symptoms on his percipient abilities," id. at 74, that possibility is far from enough to make unreasonable the SJC's conclusion that defense counsel likely would not have done so.

It was not unreasonable for the SJC to conclude the absence of missing information that would not have been used at trial cannot have been prejudicial to Ayala.  See, e.g., Lang, 15 F.4th at 69.  Here, "fairminded" jurists and "reasonable minds" at best could disagree as to whether defense counsel would have used the records.  Cf. Porter, 35 F.4th at 75 (first quoting White, 572 U.S. at 427 and then quoting Brumfield, 576 U.S. at 314).  In such a circumstance, we cannot conclude that the SJC's application of the law was unreasonable under 28 U.S.C. § 2254(d)(1) nor can we say that the SJC's factual determinations were unreasonable under 28 U.S.C. § 2254(d)(2).  For the same reason, Ayala has not shown the factual determinations to be erroneous "by clear and convincing

---

[12]    As part of their analysis of the deficiency of defense counsel's performance, the district court and Ayala on appeal argue that defense counsel's failure to pursue the missing records during trial was not and could not be consistent with a strategic choice. Medeiros, 538 F. Supp. 3d at 69-71.  That argument fails for the reasons stated above.

evidence."  28 U.S.C. § 2254(e)(1).  AEDPA forbids the grant of habeas relief.

    B.    The District Court Erred in Finding Unreasonable the SJC's Conclusions that There Was No Evidence that Suggested Perez's PTSD or Drug Use Affected his Ability to Perceive the Defendant the Morning of the Shooting

    The district court held that "[t]he SJC's finding that 'there was no evidence . . . contained within the missing records . . . that suggests that Perez's mental health struggles . . . affected his ability to perceive the defendant on the morning of the shooting' . . . [was] patently unreasonable." Medeiros, 638 F. Supp. 3d at 72 (first three omissions in original) (quoting Ayala, 112 N.E.3d at 256).  According to the district court and Ayala on appeal, "[c]ounseling notes [in the missing records] describe how certain stimuli present on the night of Mr. Ramkissoon's shooting were either triggers for or associated with Mr. Perez's PTSD symptoms . . . ." Id.  They argue that the SJC could not reasonably conclude there was no "suggest[ion]" in the records that Perez's mental health interfered with his ability to identify Ayala as the shooter.  Id.  We disagree.

    The district court erred by focusing on the SJC's use of the single word "suggests" in this sentence.  Our "highly deferential standard for evaluating state court rulings" requires that we read the SJC's opinion in such a way as to give its choice of language "the benefit of the doubt." Woodford v. Visciotti,

537 U.S. 19, 24 (2002); see also Bell v. Cone, 543 U.S. 447, 455
(2005) (per curiam) (applying this logic and reviewing the full
context of a Tennessee Supreme Court decision to determine that
the state court implicitly addressed an issue despite not
explicitly saying it was doing so). We thus must examine the
context in which the SJC used the word to determine what the SJC
meant. The SJC's use of the word "suggests" that the district
court found unreasonable appeared as part of the topic sentence of
a paragraph in the SJC's opinion which reads, in full:

> Notably, there was no evidence -- either
> introduced at trial or contained within the
> missing records -- that suggests that Perez's
> mental health struggles or drug use affected
> his ability to perceive the defendant on the
> morning of the shooting. For example, a
> defense expert's proffered testimony only
> acknowledged that Perez's mental health
> struggles "had the potential to and may have
> interfered with Mr. Perez's abilities to
> accurately perceive or recollect the
> [shooting]." Trial counsel argued this point
> specifically during closing, stating that
> Perez's diagnoses "are difficult illnesses and
> they may impact his ability to see and
> conceptualize what was actually happening."
> Additionally, although the missing records
> suggest that Perez was more dependent on
> marijuana than his testimony let on, there was
> no evidence that he was under the influence of
> marijuana on the morning of the shooting. The
> defendant's proffered expert on this point
> would not have materially added to the
> defense, as he was prepared only to testify
> that individuals have a reduced ability to
> accurately perceive reality and recall past
> events while under the influence of mind-
> altering substances. Because the substance of
> the missing records and proffered expert

> testimony was already presented to the jury,
> any error on the part of trial counsel in
> failing to notice the missing records was not
> likely to influence the jury's conclusion.
> The motion judge therefore did not err in
> denying the defendant's motion for a new
> trial.

Ayala, 112 N.E.3d at 256 (citations omitted).

Read in that context, it is clear the SJC used the phrase "no evidence . . . suggests" to mean "no evidence necessarily suggests." The district court's different reading would directly contradict the SJC's statement in the very next sentence that the defense's proffered expert would testify "that Perez's mental health struggles 'had the potential to and may have interfered with Mr. Perez's abilities to accurately perceive or recollect the [shooting].'" Id. This paragraph of the SJC's opinion read as a whole in fact concludes that no evidence in the records established with the necessary certainty that Perez's mental health struggles interfered with his ability to identify Ayala as the shooter. Even Dr. Hidalgo, whose affidavit was submitted in support of Ayala's new trial motion after he reviewed the missing records, merely stated no more than that Perez's conditions "had the potential to and may have interfered with Mr. Perez's abilities to accurately perceive or recollect the events of June 10, 2007." (Emphasis added.) As to Perez's marijuana usage, Dr. Hidalgo stated only that "mind altering substances" like marijuana "in principle can reduce the ability to accurately perceive and recall past events."

(Emphasis added.)  And defense counsel himself, during closing statements, repeatedly stressed that Perez's identification of Ayala as the shooter may have been mistaken.

Nothing in the missing records makes this conclusion by the SJC unreasonable.  Ayala focuses on the missing records of Perez's counseling sessions after the shooting.  Those missing records contain approximately ten entries after the shooting but before Ayala's trial in which counselors record Perez stating various versions of the fact that mouth injuries sometimes "triggered" Perez's PTSD and that seeing the victim's "shattered" teeth and "bloody mouth" as well as "attempt[ing] to provide mouth to mouth to [the murder victim] . . . retriggered" his PTSD at some point after the shooting, causing him to "flashback[]."  These records undoubtedly show that Perez suffered from PTSD at some point after the shooting.  Crucially, they do not render unreasonable the SJC's determination that there was no evidence that Perez was necessarily suffering from PTSD at the time of the shooting or at the time he identified the shooter.

Even if Perez's observation of Ramkissoon's injuries and attempt to provide mouth to mouth immediately retriggered Perez's PTSD, those potential triggers occurred after -- not while -- Perez observed the shooter.  Perez's recollection was, as the SJC observed, "substantially corroborated at trial by the testimony of the first-floor bouncer."  Id. at 243 n.4.

The district court omitted the phrase "or drug use" in declaring this conclusion by the SJC unreasonable. See Medeiros, 638 F. Supp. 3d at 72. On appeal Ayala argues that the SJC's determination that there was "no evidence . . . that Perez's . . . drug use affected his ability to perceive Ayala on the morning of the shooting," Ayala, 112 N.E.3d at 256 (emphasis added), was unreasonable because "Dr. Hidalgo stated that Perez's long history of heavy marijuana use reduced his 'ability to accurately perceive and recall past events . . . .'" This is an inaccurate characterization of Dr. Hidalgo's proffered testimony. The paragraph of Dr. Hidalgo's affidavit that Ayala quotes in his brief reads, in full, as follows:

> Mr. Perez has a long history of heavy marijuana use and there is no indication that at the time of the incident on June 10, 2007[,] he had reduced his marijuana use. Mind altering substances in principle can reduce the ability to accurately perceive reality and recall past events. For example, I have had patients who present to my clinic intoxicated with marijuana and who may say rude and inappropriate things at the time of their visit. In subsequent visits, when sober, they may not remember accurately the nature of their past inappropriate behavior.

(Emphasis added.) In other words, as the SJC found,

> [t]he defendant's proffered expert . . . was prepared only to testify that individuals have a reduced ability to accurately perceive reality and recall past events while under the influence of mind-altering substances.

Id.  The SJC reasoned that the missing records and this proffered testimony did not necessarily suggest that Perez's drug use interfered with his ability to identify Ayala as the shooter because

> although the missing records suggested that Perez was more dependent on marijuana than his testimony let on, there was no evidence that he was under the influence of marijuana on the morning of the shooting.

Id.  Nothing in the missing records makes this conclusion by the SJC unreasonable either.

At the least, "fairminded" jurists and "reasonable minds" could disagree, see Porter, 35 F.4th at 75, as to whether there was any evidence in the missing records "that suggests that Perez's mental health struggles or drug use affected his ability to perceive the defendant on the morning of the shooting," Ayala, 112 N.E.3d at 256.  And so habeas relief is improper under AEDPA because the SJC's conclusion was not unreasonable under 28 U.S.C. § 2254(d)(1), nor were its factual determinations unreasonable under 28 U.S.C. § 2254(d)(2).  For the same reason, Ayala has not shown the factual determinations to be erroneous "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).  AEDPA makes habeas relief inappropriate.

C.   The District Court Erred in Finding Unreasonable the
SJC's Conclusions that the Substance Contained in the Missing
Records was Already Presented to the Jury

The district court also concluded that it was
unreasonable for the SJC to conclude that "'the substance of the
missing records and proffered expert testimony was already
presented to the jury' and 'the additional records would not have
added to the information already at trial counsel's disposal and
used in cross-examination . . . .'" Medeiros, 638 F. Supp. 3d at
72.

The SJC reasonably determined that the key elements of
Ayala's argument were presented to the jury.  Much of the evidence
in the missing records is consistent with and cumulative of the
evidence the jury heard at trial.  Cumulative evidence generally
"offer[s] an insignificant benefit, if any at all" for purposes of
a Strickland claim.  Wong v. Belmontes, 558 U.S. 15, 23 (2009).
To the extent the missing records were cumulative of evidence heard
at trial, the SJC's conclusion that the records' absence did not
cause Ayala prejudice was not unreasonable.  Cf. United States v.
Abdelaziz, 68 F.4th 1, 71 (1st Cir. 2023) (explaining, in context
of harmless error review, that exclusion of evidence likely did
not affect result because similar evidence was already before
jury); Stephens v. Hall, 294 F.3d 210, 225-26 (1st Cir. 2002)
(concluding that state court's decision that failure to offer
impeachment evidence did not prejudice defendant was not

objectively unreasonable where the evidence arguably "added nothing new"). The district court identified two ways in which it concluded the missing records contained information that was not otherwise available to the jury. We address each in turn.

### 1. Purported Discrepancies Between the Missing Records and Perez's Testimony

The district court and Ayala on appeal argue that, on their reading of the record, the SJC's conclusion must be unreasonable because the counseling session notes contradict Perez's testimony that at the time of the shooting "his PTSD was 'under control'; that for him, '[i]t's just basically . . . remembering a bad time' and he 'had done the steps that [he] needed to do to get [him]self better' and the effect it had on him at the time of Mr. Ramkissoon's shooting was 'minimal.'" Medeiros, 638 F. Supp. 3d at 73 (alterations and omissions in original). That the shooting itself may have triggered in its aftermath more intense PTSD does not necessarily contradict this testimony.

Beyond this, "where [as here] the relevant error is failure to impeach a government witness, we begin [the prejudice analysis] by assessing the strength of the prosecution's case, and the effectiveness of the defense absent the impeachment evidence." Malone v. Clarke, 536 F.3d 54, 64 (1st Cir. 2008) (internal quotation marks omitted) (quoting Stephens, 294 F.3d at 218). With that context in mind, we must "then consider the potential

impeachment value of the evidence in undermining the credibility of the witness's testimony." Id. (internal quotation marks omitted) (quoting Stephens, 294 F.3d at 218).

As to the strength of the prosecution's evidence, the SJC characterized that evidence as strong enough to support a conviction even without Perez's eyewitness testimony, and Ayala develops no argument on appeal that that conclusion was unreasonable:

> The Commonwealth also presented circumstantial evidence linking the defendant to the shooting. For example, prior to the shooting, the defendant arrived at the party and refused to be searched. He was visibly upset that there was a party taking place at the house, and after being kicked out, he threatened to come back to the party and "light the place up." Soon after, he returned and kicked in the first-floor door with such force that he left a footprint on the door. Additionally, the defendant was seen pacing around on the street in front of the house just a few minutes before Perez and Ramkisson left the party and the shooting took place. From this evidence, the jury could have reasonably inferred that the defendant did not want to be searched on the morning of June 10 because he was carrying a gun, that he was still near the house when the shooting occurred, and that his anger about the party motivated him to shoot Ramkissoon as he crossed the street. This evidence, when taken together, "formed a mosaic of evidence such that the jury could conclude, beyond a reasonable doubt, that the defendant was the shooter[.]"

Ayala, 112 N.E.3d at 246 (cleaned up) (quoting Commonwealth v. Jones, 77 N.E.3d 278, 289 (Mass. 2017)).

Nor does Ayala account for the strategic decision not to increase the jury's sympathy for a veteran with honorable service by dwelling too much on the particulars of Perez's after-the-event PTSD, nor for counsel's strategic decision to address Perez as an honest witness who made a mistake as to identification in the stress and shock of the event. There is no difference between the effectiveness of the defense with or without the missing records if, as the SJC found, "it is unlikely that trial counsel would have used the information in the missing records to further attack Perez's ability to perceive the shooter due to his PTSD diagnosis even if counsel had them." Id. at 255 n.21.

Further, reasonable minds could read the missing records as consistent with Perez's trial testimony. See Porter, 35 F.4th at 75. Beginning in mid-2003, Perez's treatment providers were often annotating Perez's counseling notes with "P.R.N.," a medical abbreviation for pro re nata which meant Perez's therapist expected to see him only as needed. See PRN, Stedman's Medical Dictionary (2014). On June 10, 2007, when Ramkissoon was killed, Perez had not requested a session with his therapist since February 2007, four months earlier, and had apparently not mentioned his PTSD symptoms in therapy since August 2005, almost two years earlier.

In fact, Perez screened negative for PTSD during a medical visit at the VA Medical Center on September 8, 2006.[13]

### 2.    Availability of Expert Testimony

The district court misread the record when it concluded the SJC was unreasonable to conclude that the substance of the proffered expert testimony was before the jury.  According to the district court, "the SJC relied on trial counsel's closing argument as an adequate substitute for expert psychiatric evidence." Medeiros, 638 F. Supp. 3d at 73.

To the contrary, the SJC did not hold that trial counsel's closing argument was "an adequate substitute for expert psychiatric evidence." Id.  Rather, the SJC recognized that the specific point that Ayala proffered an expert to make -- that Perez's mental health struggles "had the potential to and may have interfered with Mr. Perez's abilities to accurately perceive or recollect the [shooting]" -- was already before the jury and had been highlighted in trial counsel's closing argument.  Ayala, 112 N.E.3d at 256 (alteration in original).

Ayala and the district court state that Ayala was prejudiced because "[d]efense counsel could not effectively argue

---

[13]    Because a reasonable person could read these records as supporting -- rather than calling into question -- Perez's testimony about his management of his mental health conditions, they also support the reasonableness of the SJC's finding that defense counsel likely would not have used them.

for expert psychological testimony . . . without the missing psychological records . . . ." Medeiros, 638 F. Supp. 3d at 53. However, it is reasonable to conclude that the trial court would not have allowed his motion for funds for expert testimony even if he had possessed the full set of records at the time of trial. At trial, defense counsel sought to offer Dr. Ebert's opinion "that anyone who suffered from a bipolar situation that was manic in its nature, that was not on medication, would be adversely affected in their ability to either perceive or encounter and recounter events that would occur." In addressing defense counsel's motion for funds to offer that expert testimony at trial, the court stated its view that "the psychiatrist, without being totally speculative, [was not] going to be able to testify how [Perez] acted on that night when [the doctor] wasn't there . . . ." The court eventually denied that motion for funds because "there's no foundation laid that he was suffering from that disease on that day."

It is certainly possible, as the SJC must have concluded, that the missing records would not have changed the trial court's perspective on these issues at all. This is particularly so given the SJC's finding that there was no evidence that Perez was necessarily suffering from PTSD at the time of the shooting or at the time he identified the shooter, meaning the SJC concluded that these records would not have laid the necessary foundation for

expert testimony. And even with the missing records, the psychiatrist's opinion about what happened on the night of the shooting would still have been "speculative," as the missing records do not change the fact that "[the doctor] wasn't there" on the night of the shooting, nor do they describe with certainty exactly when Perez's PTSD symptoms began. Even if it were possible that the missing records could have made the proposed expert testimony seem less speculative to the trial judge and offered defense counsel a stronger argument that there was a "foundation laid that he" was possibly suffering from PTSD on the day in question, that possibility is far from enough to justify habeas relief. Even accounting for those possibilities, Ayala has shown, at most, that "fairminded" jurists and "reasonable minds" could disagree. See Porter, 35 F.4th at 75. And so habeas relief is improper under AEDPA.

The SJC also stated that the "defense expert's proffered testimony only acknowledged that Perez's mental health struggles 'had the potential to and may have interfered with [his percipient abilities],'" Ayala, 112 N.E.3d at 256 (emphasis added), not that there was any certainty of interference. That theme of potential interference was certainly before the jury. Habeas relief under AEDPA is improper. See Porter, 35 F.4th at 75.

**IV.  Conclusion**

Under AEDPA and <u>Strickland</u>'s doubly deferential standard, we conclude that the district court erred in granting relief.  We <u>vacate</u> and order that Ayala's petition for a writ of habeas corpus on his ineffective assistance of counsel claim for failure to notice the missing records be <u>denied</u>.